**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    PAUL D. COLE,                              No. C-03-5643 EMC

9              Plaintiff,

10        v.                                    **ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANT'S**
11   DOE 1 THRU 2 OFFICERS OF THE CITY          **MOTION FOR SUMMARY JUDGMENT**
     OF EMERYVILLE POLICE                       **(Docket No. 57)**
12   DEPARTMENT,

13             Defendants.
     _____/
14

15

16        Plaintiff Paul D. Cole has filed suit against Defendants the City of Emeryville, Officer

17   Edward Mayorga, and Officer Robert Alton for violation of his civil rights.  More specifically, Mr.

18   Cole has sued the individual officers for violation of § 1983 (the right to be free from unreasonable

19   searches and seizures and to equal protection); violation of California Civil Code § 52.1 and the

20   California Constitution, article I, § 13 (the right to be free from unreasonable searches and seizures);

21   battery; and false imprisonment.  Mr. Cole has sued the City for a § 1983 violation (the right to be

22   free from unreasonable searches and seizures).  Currently pending before the Court is Defendants'

23   motion for summary judgment.

24        Having considered the parties' briefs and accompanying submissions, as well as the oral

25   argument of counsel, the Court hereby GRANTS in part and DENIES in part the motion for

26   summary judgment.

27

28

**United States District Court**
For the Northern District of California

## I.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmoving's favor. *See id.* at 255.

## II.   <u>FACTS</u>

The facts, viewed in Mr. Cole's favor, are as follows.  It is undisputed that, on or about April 4, 2003, Mr. Cole was driving in Oakland when he had an encounter with Officer Mayorga and Officer Alton.  That encounter consisted of: (1) a stop; (2) a detention; and (3) a search of Mr. Cole's car, both the interior and trunk.

A.   <u>Initial Stop</u>

Prior to the stop, Officer Mayorga had information from an informant that Mr. Cole was selling drugs in the 3400 or 3200 block of Hannah in Oakland.  *See* Novotny Decl., Ex. B (Mayorga Dep. at 52); *see also* Novotny Decl., Ex. D (Diotalevi Dep. at 45); McHenry Decl., Ex. 3 (Alton Dep. at 49).  A day or so before the stop, Officer Mayorga asked dispatch for information about Mr. Cole to see, *e.g.*, if he had any warrants.  *See id.*, Ex. 2 (Mayorga Dep. at 37-38) (also stating that he might have checked himself for information on Mr. Cole).  Although there is some evidence that Officer Mayorga was told that Mr. Cole had a suspended driver's license (*see* McHenry Decl., Ex. 9 (Tr. at 3-4)), there is also evidence (from the dispatcher PST Janet Tso) that Officer Mayorga was told that Mr. Cole had a valid license.  *See* McHenry Decl., Ex. 7 (Tr. at 3-4) ("I'm not sure but I believe I said 'valid.'").

**United States District Court**
For the Northern District of California

1    There is no dispute that Officer Mayorga did not try to get an arrest or search warrant for Mr.

2    Cole based on the information that Officer Mayorga had.  *See id.*, Ex. 2 (Mayorga Dep. at 55).

3    Instead, Officer Mayorga and Officer Alton asked permission of Sgt. Dante Diotalevi to be in

4    Oakland because of the information in their possession.  *See id.*, Ex. 8 (Tr. at 1).  Drawing the

5    inferences in Mr. Cole's favor, Officers Mayorga and Alton decided to specifically target Mr. Cole.

6    A day later, Mr. Cole was on his way from work to meet with family members to make

7    funeral arrangements for his mother who had passed away two days earlier.  *See* McHenry Decl., Ex.

8    1 (Cole Decl. ¶ 3).  As he made a left onto a street called Louise, he saw a police car backing up and

9    parking at the next intersection.  *See id.* (Cole Decl. ¶ 4).  At the intersection of Louise and 32d, Mr.

10   Cole pulled up right next to the police car.  *See id.* (Cole Decl. ¶ 5).  He looked directly at the two

11   officers inside their vehicle and made eye contact with one of them.  *See id.* (Cole Decl. ¶ 5).

12   Because Mr. Cole saw the officers, he made certain to follow every traffic law, including making a

13   complete stop at Louise and 32d.  *See id.* (Cole Decl. ¶ 6).  Mr. Cole then made a left turn onto 32d.

14   *See id.* (Cole Decl. ¶ 6).  Before Mr. Cole reached the next intersection at 32d and Helen, the

15   officers initiated a stop, using lights and a siren.  *See id.* (Cole Decl. ¶¶ 7-8).  Mr. Cole made a

16   complete stop at the intersection of 32d and Helen and then pulled over.  *See id.* (Cole Decl. ¶¶ 7-8).

17   The officers contend that Mr. Cole failed to come to a complete stop at the stop sign which

18   led to the police stop.  Even though Officer Mayorga states that he believed Mr. Cole was driving on

19   a suspended license at the time, there is no dispute that the reason for the stop was the stop sign

20   violation.  *See* Novotny Decl., Ex. B (Mayorga Dep. at 32); *id.*, Exs. E-F (interrogatory responses of

21   Officer Mayorga and Officer Alton).  The officers' accounts differ as to the actual location of the

22   violation.  Officer Mayorga states that the violation occurred at the intersection at 32d and Helen

23   while Officer Alton states that the violation occurred at 32d and Louise.  *See id.*, Ex. C (Alton Dep.

24   at 18).

25   B.    <u>Detention and Search of Mr. Cole's Car (Interior and Trunk)</u>

26   After Mr. Cole was stopped by Officer Mayorga and Officer Alton, the officers asked Mr.

27   Cole for, *inter alia*, his driver's license.  *See* McHenry Decl., Ex. 1 (Cole Decl. ¶ 9); Novotny Decl.,

28   Ex. A (Cole Dep. at 49).  The officers ran Mr. Cole's license, which came back suspended.  *See id.*,

3

1    Ex. B (Mayorga Dep. at 14).  Mr. Cole was thus ordered out of the car.  *See* McHenry Decl., Ex. 1

2    (Cole Decl. ¶¶ 10-11); Novotny Decl., Ex. A (Cole Dep. at 56-57).  Mr. Cole was under arrest

3    because he was driving without a valid license.  *See id.*, Ex. B (Mayorga Dep. at 16); *see also id.*,

4    Exs. E-F (interrogatory responses of Officer Mayorga and Officer Alton).  He was then cuffed.

5         A tow truck was called in order to take care of Mr. Cole's car.  *See* Novotny Decl., Ex. B

6    (Mayorga Dep. at 16, 22); *id.*, Ex. C (Alton Dep. at 37).  Ultimately, the car was not towed away and

7    the tow truck was cancelled after the officers learned Mr. Cole's license was valid.  *See* Novotny

8    Decl., Ex. B (Mayorga Dep. at 16, 22).  Prior to that, however, Officer Mayorga and Officer Alton

9    commenced an inventory search of Mr. Cole's car.  *See id.* (Mayorga Dep. at 45-46); *id.*, Ex. C

10   (Alton Dep. at 82); *id.*, Ex. D (Diotalevi Dep. at 44).  According to Officer Mayorga, an inventory

11   form was started but must have been shredded because the officers later learned that Mr. Cole's

12   driver's license was in fact valid.  *See id.*, Ex. B (Mayorga Dep. at 45-46).

13        Mr. Cole's car was searched not only as part of an inventory search but also as part of a

14   search for Mr. Cole's insurance papers.  Although disputed by the officers, Mr. Cole states that he

15   had given his insurance papers to the police earlier when his car was first stopped.  *See id.*, Ex. A

16   (Cole Dep. at 49); McHenry Decl., Ex. 1 (Cole Decl. ¶ 9).  Mr. Cole also claims that he told the

17   officers that he could get the insurance papers for the officers but was refused that opportunity.  *See*

18   *id.*, Ex. 5 (Cole Dep. at 78).

19        During the search of Mr. Cole's car and while Mr. Cole was detained, the officers were

20   notified by dispatch that a mistake had been made and that Mr. Cole's driver's license was actually

21   valid, not suspended.  *See* Novotny Decl., Ex. C (Alton Dep. at 36-37).  According to Mr. Cole, he

22   was told by the officers that his license was not suspended but that he was *not* then released; instead

23   he was detained in the back of the police car, and the search continued.  *See* McHenry Decl., Ex. 1

24   (Cole Decl. ¶¶ 18-20).  In addition, according to Mr. Cole, one of the officers asked him repeatedly

25   if there was anything in the trunk that the officers should know about and that the officer suggested

26   that he would take the handcuffs off and release Mr. Cole if and when Mr. Cole consented to the

27   search of the trunk.  *See id.*  Mr. Cole claims that he finally consented to the search of the trunk to

28

United States District Court

For the Northern District of California

1    end the ordeal and that, only after the trunk was searched, was he let out of the police car and

2    uncuffed.  *See id.* (Cole Decl. ¶¶ 18-20).

3         Mr. Cole's account of the timing of his release and termination of the search are disputed by

4    the officers.  The officers further contend that Mr. Cole was immediately released from the back of

5    the police car and the cuffs taken off, *see* Novotny Decl., Ex. D (Diotalevi Dep. at 18); *id.*, Ex. B

6    (Mayorga Dep. at 21-22), and that only then did Officer Mayorga ask Mr. Cole permission to search

7    the trunk of the car, to which Mr. Cole voluntarily assented.  *See id.* (Mayorga Dep. at 21-22); *id.*,

8    Ex. C (Alton Dep. at 43-44).

9         At the conclusion of the encounter, Mr. Cole was issued a citation for failing to stop at the

10   intersection.  According to Mr. Cole, he had no recollection of being told that he ran the stop sign

11   before he was actually handed the ticket.  *See* McHenry Decl., Ex. 1 (Cole Decl. ¶ 21).  When Mr.

12   Cole asked why he was being given the ticket, one of the officers said it was to "cover [his] ass."  *Id.*

13   (Cole Decl. ¶ 21).

14        Subsequently, Mr. Cole challenged the traffic citation before the traffic commissioner for

15   Alameda County.  Based on the records submitted to the Court and the accounts provided at oral

16   argument, this proceeding was summary.  Mr. Cole was not represented nor is there any indication

17   that he had any pre-trial discovery or opportunity for extensive cross-examination.  After the citation

18   was sustained, Mr. Cole appealed to the Alameda County Superior Court, where the citation was

19   once again upheld on a settled statement rather than live testimony.  *See* RJN, Exs. 1-5.[1]

20                    **III.    DISCUSSION**

21   A.    Section 1983 Claim Based on Equal Protection

22        As a preliminary matter, the Court notes that all of the § 1983 claims raised by Mr. Cole are

23   based on the Fourth Amendment (*i.e.*, unreasonable search or seizure), except for one § 1983 claim

24   against the individual officers which is based on the Fourteenth Amendment (*i.e.*, equal protection).

25   Mr. Cole's § 1983 claim based on the Fourteenth Amendment is predicated on the allegation that the

26   _____

27        [1] Defendants have asked the Court to take judicial notice of state court documents related to the
     traffic violation.  Mr. Cole has not opposed the request for judicial notice.  Because Mr. Cole does not
28   oppose the request and because state court documents may be judicially noticed pursuant to Federal
     Rule of Evidence 201, the Court grants the request.

officers' actions in stopping and then detaining and searching Mr. Cole were racially motivated.

*See, e.g.*, FAC ¶¶ 12, 14 (claiming that, "because [Mr. Cole] was an African American driving a late model car, the Emeryville police officers initiated a traffic stop" and that, "[n]otwithstanding the fact that Mr. Cole provided a valid driver's license, because he is an African American, he was ordered out of the vehicle, searched, handcuffed and locked in the back of the police car").

As part of their motion for summary judgment, Defendants argued that the equal protection-based claim should be dismissed, not only under the *Heck* rule (discussed below) but also because of a lack of evidence regarding a racially discriminatory intent or motive on the part of the officers. *See* Mot. at 5. Mr. Cole failed to address this argument in his opposition. At the hearing, Mr. Cole confirmed that he was no longer pursuing this claim. Therefore, Defendants' motion for summary judgment on the § 1983 claim against the officers to the extent it is based on the Fourteenth Amendment only (not the Fourth) is granted.

B.      Section 1983 Claims Based on the Fourth Amendment

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is *not* cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* at 486-87. Defendants argue that, under the *Heck* rule, all of Mr. Cole's § 1983 claims based on the Fourth Amendment are barred (both those asserted against the individual officers and the City) because the claims "would necessarily imply the unlawfulness" of Mr. Cole's conviction for a traffic violation. Mot. at 4.

6

United States District Court

For the Northern District of California

The Court rejects the argument for several reasons.  First, not all of Mr. Cole's § 1983 claims would *necessarily* imply the invalidity of his conviction for a traffic violation.  *See Harvey v. Waldron*, 210 F.3d 1008, 1015-16 (9th Cir. 2000) (rejecting a general exception to *Heck* for § 1983 Fourth Amendment unreasonable search and seizure claims; applying a fact-intensive inquiry to see if § 1983 claim would necessarily imply invalidity of underlying conviction).  Mr. Cole's federal claims are predicated on (1) an unreasonable stop, (2) an unreasonable detention, and (3) an unreasonable search.  Only the claims directly related to the initial stop -- *i.e.*, that the officers had no probable cause for the stop -- would necessarily imply the invalidity of Mr. Cole's traffic conviction.  *See, e.g.*, *Quintana v. Gates*, No. CV 00-07166 GAF (AJWx), 2004 U.S. Dist. LEXIS 14887, at *26-27 (C.D. Cal. July 27, 2004) ("To prevail on false arrest claim, a plaintiff must demonstrate that the defendants lacked probable cause to arrest him.  When the facts supporting the officers' probable cause determination are the same as the facts supporting the plaintiff's conviction, a finding that the officers lacked probable cause would 'necessarily imply the invalidity' of the plaintiff's conviction."); *Falcone v. Village of Hanover Park*, No. 02 C 8747, 2004 U.S. Dist. LEXIS 25293, at *26-28 (N.D. Ill. Dec. 10, 2004) (rejecting a categorical rule that any and all claims for unlawful arrest barred by subsequent conviction that stems from that arrest; but agreeing that, in this case, for plaintiff to succeed on her false arrest claim it would necessarily impugn validity of her conviction).  The other claims would not.

For example, a judgment in favor of Mr. Cole with respect to the claim that he was improperly detained because he was not released immediately after the officers learned about the mistake regarding his driver's license would not affect the validity of his conviction for failure to stop at a stop sign.  The same is true with respect to Mr. Cole's claim that his car (both interior and trunk) were improperly searched.  *See, e.g.*, *id.* at *34 (concluding that plaintiff's unreasonable search and seizure claim was not precluded by *Heck* because blood and urine samples, even if taken unlawfully, were taken from plaintiff well after actions that support her resisting arrest conviction -- possible that jury could find that she resisted arrest while at roadside and then was unlawfully searched or seized by taking of samples at hospital or police station); *Fritz v. City of Corrigan*, 163 F. Supp. 2d 639, 642 (E.D. Tex. 2001) (concluding that plaintiff's claim of unreasonable detention

United States District Court

For the Northern District of California

1   was not barred by *Heck* because whether detention was constitutionally reasonable would not affect

2   his conviction for speeding); *Sumpter v. Bolingbrook Police Dep't*, No. 94 C 1306, 1996 U.S. Dist.

3   LEXIS 3699, at *7-8 (N.D. Ill. Mar. 27, 1996) (holding that plaintiff's claims of illegal search and

4   lack of probable cause to arrest not precluded by *Heck* because resolution of claims in plaintiff's

5   favor would not imply invalidity of his conviction for aggravated battery which was based on an

6   incident that took place after plaintiff was taken into custody).

7        Second, as to the claims directly related to the initial stop, the Court concludes that, under

8   current Ninth Circuit law, *Heck* is not applicable.  In *Heck*, the § 1983 plaintiff was in custody as a

9   state prisoner.  Speaking for four justices of the Court, Justice Souter, in his concurrence, explained

10  that a § 1983 claim for damages would be barred only if the plaintiff was still "in custody" (*e.g.*, in

11  prison or on probation or parole) at the time the damages suit was brought.  Once the individual is

12  no longer in custody and hence no habeas remedy is available, he or she should be free to sue for

13  violation of civil rights under § 1983.  Justice Souter elaborated:

14          [T]he alternative would needlessly place at risk the rights of those
            outside the intersection of § 1983 and the habeas statute, individuals
15          not "in custody" for habeas purposes.  If these individuals (people who
            were merely fined, for example, or who have completed short terms of
16          imprisonment, probation, or parole, or who discover (through no fault
            of their own) a constitutional violation after full expiration of their
17          sentences), like state prisoners, were required to show the prior
            invalidation of their convictions or sentences in order to obtain § 1983
18          damages for unconstitutional conviction or imprisonment, the result
            would be to deny any federal forum for claiming a deprivation of
19          federal rights to those who cannot first obtain a favorable state ruling.
            The reason, of course, is that individuals not "in custody" cannot
20          invoke federal habeas jurisdiction, the only statutory mechanism
            besides § 1983 by which individuals may sue state officials in federal
21          court for violating federal rights.  That would be an untoward result.

22  *Id.* at 500 (Souter, J., concurring).

23       Although Justice Souter did not represent the views of the Court in *Heck*, subsequently, in

24  *Spencer v. Kemna*, 523 U.S. 1, 18-21 (1998) Justice Souter's view, reiterated in another

25  concurrence, (*id.* at 20-21 (Souter, J., concurring)), was joined by four members of the Supreme

26  Court.  *See id.* (Souter, O'Connor, Ginsburg, and Breyer, J.J., concurring); *id.* at 21-22 (Ginsburg, J.,

27  concurring); *id.* at 22-25 (Stevens, J., dissenting).

28

United States District Court

For the Northern District of California

1    In *Muhammad v. Close*, 540 U.S. 749 (2004), the Supreme Court acknowledged that

2    "[m]embers of the Court have expressed the view that unavailability of habeas for other reasons may

3    also dispense with the *Heck* requirement." *Id.* at 752 n.2 (citing both Justice Souter's concurrence as

4    well as Justice Ginsburg's).  The Court added, however, that "[t]his case is no occasion to settle the

5    issue." *Id.*  Thus, at present, under Supreme Court precedent, it is an open question as to whether

6    the *Heck* rule is applicable when a person is no longer in custody and thus has no habeas remedy.

7    While the Supreme Court has not decided the issue, the Ninth Circuit has.  In *Nonnette v.*

8    *Small*, 316 F.3d 872 (9th Cir. 2002), the Ninth Circuit held that the *Heck* rule is only a bar to a §

9    1983 claim if a plaintiff is trying to assert the claim while he or she is still in custody, in which case

10   the proper remedy for the plaintiff is a habeas action, not a § 1983 action.[2]  *See id.* at 876-77 & n.5

11   (emphasizing that "*Heck* dealt with a prisoner who was still incarcerated, and thus where a remedy

12   in habeas corpus was available").  In *Guerrero v. Gates*, 357 F.3d 911 (9th Cir. 2004), the Ninth

13   Circuit reaffirmed its holding in *Nonnette*, *see id.* at 917 (acknowledging that there are exceptions to

14   the *Heck* rule as "suggested by dissenting members of the Supreme Court in *Spencer v. Kemna and*

15   *embodied in our recent decision of Nonnette v. Small*") (emphasis in original), though concluding

16   that the *Nonnette* exception to *Heck* does not apply where the habeas remedy was lost as a result of

17   the plaintiff's lack of diligence.  *See id.* at 918.  Under Ninth Circuit law, therefore, where habeas is

18   not available through no fault of the plaintiff, *Heck* does not bar a § 1983 suit.

19   In the Ninth Circuit's view, consistent with those of Justice Souter and four other justices,

20   the purpose of the *Heck* rule is to strike a balance between habeas corpus and § 1983 by limiting the

21

22   _____

        [2] It should be noted that the Ninth Circuit later "emphasize[d] that our holding affects only

23   former prisoners challenging loss of good-time credits, revocation of parole or similar matters,"
     *Nonnette*, 316 F.3d at 878 n.7, so the argument could be made that the instant case is distinguishable

24   because a conviction for a traffic violation is not sufficiently similar to a loss of good-time credits,
     revocation of parole, or the like.  The problem with this argument is that the Ninth Circuit's focus in

25   *Nonnette* was on the availability of the habeas remedy; even a released prisoner could still challenge an
     underlying conviction or sentence through a habeas petition where there are collateral consequences.

26   *See id.* ("[T]he status of prisoners challenging their underlying convictions or sentences does not change
     upon release, because they continue to be able to petition for a writ of habeas corpus.").  In contrast,

27   there would be no collateral consequences attendant with, *e.g.*, a loss of good-time credits when the
     sentence was already served.  *See id.*  In the instant case, there is no evidence demonstrating that there

28   are collateral consequences arising from a traffic conviction such that Mr. Cole would have a habeas
     remedy available.

1  latter where necessary to preserve the exhaustion requirement of habeas.  *See id.* at 917 (concluding

2  that plaintiff could not pursue a § 1983 claim when he "had the opportunity to seek habeas relief and

3  completely failed to do so").  If no habeas remedy is available because a party is no longer in

4  custody, permitting a § 1983 suit would not compromise the exhaustion requirement.  *See, e.g.*,

5  *Haddad v. California*, 64 F. Supp. 2d 930, 937 (C.D. Cal. 1999) (rejecting defendants' argument that

6  plaintiff's § 1983 claim was barred; "*Heck* is not applicable here because [plaintiff] is not in

7  custody").

8         To read *Heck* more broadly would extend *Heck's* rationale beyond the purpose of preserving

9  a procedural strictures of habeas corpus (specifically, the exhaustion requirement) and the interest of

10  finality that inhere therein.  Although it may be argued that *Heck* should extend more broadly to

11  further the interest in finality of criminal judgments, the interest in finality is already accounted for

12  in the normal application of preclusion doctrines, especially applied in conjunction with the habeas

13  exhaustion requirement.  "In a federal § 1983 suit, the same preclusive effect is given to a previous

14  state court proceeding as would be given to that proceeding in the courts of the State in which the

15  judgment was rendered."  *Leather v. Ten Eyck*, 180 F.3d 420, 424 (2d Cir. 2001); *see also Honey v.*

16  *Distelrath*, 195 F.3d 531, 533 (9th Cir. 1999) ("[A] petitioner's state court judgment has the same

17  claim preclusive effect in federal court that the judgment would have in the state courts.").

18         In that regard, it is significant to this case that, under California preclusion law, a

19  misdemeanor conviction is not necessarily binding in a subsequent civil action, its effect depends

20  upon the circumstances.  *See* 7 Witkin Cal. Proc. Judgment § 333 (noting that the collateral estoppel

21  effect of a misdemeanor conviction should be determined on a case-by-case basis because, for a

22  misdemeanor, a party might not have the motivation to fully litigate the charges).  For traffic

23  violations, California Vehicle Code § 40834 specifically provides that "[a] judgment of conviction

24  for any violation of this code . . . shall *not* be res judicata or constitute a collateral estoppel of any

25  issue determined therein in any subsequent civil action."  Cal. Veh. Code § 40834 (emphasis added).

26  In this case, Mr. Cole was subject to a traffic violation only.  Therefore his conviction has no

27  preclusive effect under California law.

28

**United States District Court**
For the Northern District of California

1    The facts of this case further demonstrate why preclusion would not be appropriate.  From

2    what the Court can glean from the record and based on counsel's representations at the hearing, Mr.

3    Cole was not represented by counsel, had no discovery rights, and no extensive opportunity to cross-

4    examine the officers during the proceedings before the traffic commissioner and state court.  The

5    fact, for instance, that the officers had decided the day before the incident in question to target Mr.

6    Cole for investigation and made a special effort to investigate him could have raised substantial

7    questions about motive for the traffic stop and the officers' credibility.  Mr. Cole was not aware that

8    he had been specifically targeted by the officers in advance, his only claim before the traffic court

9    was based on alleged racial profiling.

10   To hold that the traffic conviction, though not binding under California preclusion law,

11   nonetheless bars Mr. Cole's federal civil rights claim under *Heck* would effectively impose a rule of

12   "super-finality" that transcends habeas corpus requirements and normally applicable doctrines of

13   preclusion.  The result would be that a state claim is not barred, but a federal claim under § 1983

14   would be.  Such a sweeping result finds no textual or historical support in § 1983.  *See Heck*, 512

15   U.S. at 501-02 (Souter, J., concurring).  Indeed, such a differential result precluding a § 1983 claim

16   but not a state law claim would be inconsistent with the remedial purpose of § 1983 "to interpose the

17   federal courts between the states and the people, as guardians of the people's federal rights."

18   *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).  Absent clear direction from the Supreme Court or the

19   Ninth Circuit to the contrary, this Court concludes Mr. Cole's traffic conviction does not bar his §

20   1983 claim for an unconstitutional stop.

21   At the hearing, Defendants argued for the first time that, because the *Heck* rule is animated

22   by a concern for the habeas process, the Court should apply habeas standards to Mr. Cole's § 1983

23   claims -- more specifically, that the Court should not take a second look at the validity of Mr. Cole's

24   traffic conviction absent "new facts" challenging the validity of the conviction.  *Cf.* 28 U.S.C. §

25   2254(e) (providing that "a determination of a factual issue made by a State court shall be presumed

26   to be correct" and that, "[i]f the applicant has failed to develop the factual basis of a claim in State

27   court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant

28   shows [*inter alia*] that . . . a factual predicate that could not have been previously discovered through

United States District Court
For the Northern District of California

1  the exercise of due diligence").  Defendants, however, admitted that they had no authority to support

2  the application of habeas standards to § 1983 cases.  No court has ever held or suggested that § 1983

3  claims are evaluated other than *de novo*.[3]

4      Because *Heck* does not bar Mr. Cole's § 1983 claims, the Court now turns to the question of

5  whether summary judgment is warranted on the merits with respect to the either the § 1983 claims

6  against the individual officers or the § 1983 claim against the City.

7  C.    <u>Section 1983 Claims Against Individual Officers</u>

8      Mr. Cole argues that summary judgment should not be granted on the § 1983 claims against

9  the individual officers because there are genuine disputes of fact regarding the initial stop, the

10 detention, and the search of his car (both the interior and trunk).  Defendants argue that there are no

11 such disputes and that even if there were, the officers are protected by qualified immunity.

12     1.    <u>Genuine Disputes re Initial Stop, Detention, and Search of Mr. Cole's Car</u>

13         a.    <u>Initial Stop</u>

14     A police officer's decision to stop a person in a car is reasonable where the officer has

15 probable cause to believe that a traffic violation has occurred.  *See United States v. Wallace*, 213

16 F.3d 1216, 1219 (9th Cir. 2000).  "The fact that the alleged traffic violation is a pretext for the stop

17 is irrelevant, so long as the objective circumstances justify the stop."  *Id.*

18     In the instant case, there is a genuine dispute of fact about whether the officers had probable

19 cause to initiate the traffic stop of Mr. Cole, and therefore summary judgment is inappropriate.

20 Defendants are correct that whether the stop of Mr. Cole was pretextual is irrelevant so long as they

21 had probable cause to stop him.  But Mr. Cole's testimony is sufficient to raise a question about

22 whether the officers had probable cause in the first place.  According to Mr. Cole, not only did he

23 make a complete stop but he was sure to do so because he had already seen the police officers in the

24 vicinity.  *See* Cole Decl. ¶¶ 5-6 (stating, *inter alia*, that he pulled up right next to the police car at the

---

[3] Even though Defendants claim that Mr. Cole does not have any new facts to challenge the traffic conviction, Mr. Cole asserts that he does -- *i.e.*, that, during the state court proceedings, he argued that the police stopped him because of racial profiling and that only later with this litigation did he learn that the police had targeted him as a potential drug dealer in advance of the traffic stop.  *See* RJN, Ex. 4 (settled statement) (stating that basis of appeal of traffic conviction was that Mr. Cole was the victim of a "racial profile stop").

United States District Court

For the Northern District of California

1   intersection of Louise and 32d, that he looked directly at the two officers inside their vehicle and

2   made eye contact with one of them, and that he made certain to follow every traffic law, including

3   making a complete stop at Louise and 32d because he had seen the officers).

                    b.    Detention

5        Mr. Cole's argument that the police officers unreasonably detained him is not based on any

6   theory that the officers actually knew that Mr. Cole's license was valid before dispatch informed

7   them of its mistake.  Rather, Mr. Cole's argument is that there was an unreasonable detention

8   because, once the officers were informed of dispatch's mistake, they did not immediately release

9   him but rather continued to detain him (in handcuffs) and continued searching his car.  *See* Opp'n at

10  9 ("Mr. Cole claims he remained in the bank of the patrol car in handcuffs after the Officers were

11  aware of their error until the Officers finished searching his car.").

12       In support of this argument, Mr. Cole cites cases establishing a person's liberty interest in

13  being free from mistaken incarceration.  *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th

14  Cir. 2001) ("[T]he loss of liberty caused by an individual's mistaken incarceration 'after the lapse of

15  a certain amount of time' gives rise to a claim under the Due Process Clause of the Fourteenth

16  Amendment.  As one court explained, a detainee has 'a constitutional right to be free from continued

17  detention after it was or should have been known that the detainee was entitled to release.'").

18  Although Defendants contest the applicability of this line of cases (under the Fourteenth

19  Amendment) because they involve incarceration and not detention, it is not clear (and Defendants

20  cite no contrary authority) why that should make a material difference.  Both incarceration and

21  detention can constitute a deprivation of liberty.  In any event, there is also a line of cases under the

22  Fourth Amendment directly on point; namely, a detention is an unreasonable seizure when its

23  duration exceeds that supported by probable cause.  *See United States v. Dortch*, 199 F.3d 193, 199-

24  200 (5th Cir. 1990) (**"**Once [defendant] was not permitted to drive away, the extended detention

25  became an unreasonable seizure, because it was not supported by probable cause.  To hold otherwise

26  would endorse police seizures that are not limited to the scope of the officers' reasonable suspicion

27  and that extend beyond a *reasonable duration*.") (emphasis added).

28

                                        13

**United States District Court**
For the Northern District of California

1    There is a genuine dispute as to whether Mr. Cole was unreasonably detained after the

2    officers learned that his driver's license was in fact valid and not suspended.  Although arguably the

3    officers could have reasonably continued to detain Mr. Cole so as to complete the process of citing

4    him for the alleged traffic violation, Mr. Cole claims that the officers left him in the back seat of the

5    police car for several  minutes -- not to fill out a traffic citation but to continue searching his car.

6    Defendants conceded at the hearing that, construing all evidence in Mr. Cole's favor, there is a

7    genuine dispute regarding the reasonableness of the detention.

8              c.    <u>Search of Car</u>

9    Mr. Cole does not challenge Defendants' contention that, because they had probable cause to

10   arrest Mr. Cole because of the suspended driver's license, they had the authority to take his car into

11   custody and do an inventory search of the car.  *See United States v. Mancera-Londono*, 912 F.2d

12   373, 376 (9th Cir. 1990) ("'Before an inventory search is permissible, the government must have

13   legitimate custody of the property to be inventoried, either as a result of lawful arrest or by some

14   other method.'"); Cal. Veh. Code §14602.6(a) ("Whenever a peace officer determines that a person

15   was driving a vehicle while his or her driving privilege was suspended or revoked . . . , the peace

16   officer may either immediately arrest that person and cause the removal and seizure of that vehicle

17   or, if the vehicle is involved in a traffic collision, cause the removal and seizure of the vehicle,

18   without the necessity of arresting the person in accordance with Chapter 10 . . . .").  Rather, Mr.

19   Cole's argument is that the officers improperly continued to search his car "without consent *after* the

20   inventory search should have ceased" when they learned his license was valid.  Opp'n at 10

21   (emphasis added).

22   There is enough to create a genuine dispute of fact precluding summary judgment.

23   According to Mr. Cole, the officers continued their search after learning his license was not

24   suspended.  He also asserts that the officers searched for his insurance papers without his consent as

25   part of that continued search.  *See* McHenry Decl., Ex. 5 (Cole Dep. at 78).  A finder of fact could

26   find that this continued search violated the Fourth Amendment.  *See United States v. Ibarra*, 345

27   F.3d 711, 715 (9th Cir. 2003) ("Officers may search an automobile so long as they have probable

28   cause.").

d.      Search of Trunk of Car

As noted above, the circumstances surrounding the officers' search of the trunk of Mr. Cole's car are disputed.  According to Mr. Cole (but contested by the officers), he was told by the officers that his license was not suspended, but he was not then released from the back of the police car.  *See* McHenry Decl., Ex. 1 (Cole Decl. ¶¶ 18-20).  Rather, one of the officers asked him repeatedly if there anything in the trunk that the officers should know about; the officer also suggested that he would take off the handcuffs and release Mr. Cole only if Mr. Cole consented to the search of the trunk.  *See id.*  Mr. Cole claims that he finally consented to the search of the trunk to end the ordeal and that, only after the trunk was searched was he let out of the police car and uncuffed.  *See id.* (Cole Decl. ¶¶ 18-20).

The question is whether, based on Mr. Cole's version of the facts, a reasonable jury could conclude that Mr. Cole's consent to the search of the trunk was involuntary.  "The question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  There is enough here to create a genuine dispute of fact regarding voluntariness.  One of the factors to consider regarding voluntariness is whether promises were made to the party from whom the officers sought consent.  *See United States v. Watson*, 423 U.S. 411, 425 (1976) (concluding that, under the totality of the circumstances, defendant's consent voluntary because, *inter alia*, no overt act or threat of force against defendant was proved or claimed, no promises were made to him, and there was no indication of more subtle forms of coercion that might flaw his judgment).  Here, Mr. Cole claims that the officers had no basis to continue to hold him in custody after learning of dispatch's mistake regarding his driver's license but that the officers kept him in handcuffs and suggested that the cuffs would be taken off only if Mr. Cole consented to the search of the trunk.

**United States District Court**
For the Northern District of California

1

        e.     <u>Summary</u>

2

       Because there are genuine disputes of fact regarding the initial stop, detention, and search of

3

Mr. Cole's car, summary judgment with respect to the § 1983 claims against the individual officers

4

is improper.

5

     2.     <u>Qualified Immunity</u>

6

       Defendants argue, however, that, even if there were unreasonable searches and seizures in

7

the instant case, summary judgment is still appropriate because the officers are entitled to qualified

8

immunity.

9

                In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme

10

Court established a two-prong analysis for qualified immunity cases. First, a court must determine whether the facts alleged (resolving all disputes of fact in favor of the party asserting the injury) show that the

11

officer's conduct violated a constitutional right. "Taken in the light most favorable to the party asserting the injury, do the facts alleged

12

show the officer's conduct violated a constitutional right? This must be the initial inquiry." If the court determines that the conduct did not

13

violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

14

15

                If, however, the court determines that the conduct did violate a constitutional right, the second prong under *Saucier* requires the court to determine whether the violated right was "clearly established." A

16

right is clearly established if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.." Even if the violated right is clearly

17

established, the *Saucier* Court recognized that it may be difficult for a police officer to determine how to apply the relevant legal doctrine to

18

the particular circumstances he or she faces. The *Saucier* Court therefore held that if the officer makes a mistake in applying the

19

relevant legal doctrine, he or she is not precluded from claiming qualified immunity so long as the mistake is reasonable. That is, if

20

"the officer's mistake as to what the law requires is reasonable . . . the

21

officer is entitled to the immunity defense."

22

*Kennedy v. Ridgefield City*, 411 F.3d 1134, 1141-42 (9th Cir. 2005).

23

       The analysis in Part III.C.1, *supra*, addresses the first *Saucier* prong – *i.e.*, a reasonable jury

24

could find that Mr. Cole's rights under the Fourth Amendment were violated when (1) the officers

25

stopped him without probable cause; (2) detained him after discovering there was no basis for the

26

arrest for driving with a suspended license; and (3) after the inventory search, searched his car

27

(including the trunk) without probable cause and without his consent.

28

16

**United States District Court**
For the Northern District of California

1    As for the second *Saucier* prong, Defendants have not made the case that the violated rights

2    were not clearly established.  Moreover, if Mr. Cole's version of the facts are believed, the officers'

3    actions were purposeful: They stopped him knowing there was no traffic violation in order to effect

4    a search; they detained him and continued searching his car well after they learned his license was

5    valid and therefore had no probable cause for any continued detention or search; and they held him

6    in handcuffs until he agreed to the search of his trunk.  If Mr. Cole were to establish purposeful

7    violation of clearly established rights, the officers wold not be shielded by qualified immunity.  *Cf.*

8    *Crawford-El v. Britton*, 523 U.S. 574, 589 n.11 (1998) (quoting *Martin v. D.C. Metropolitan Police*

9    *Dep't*, 812 F.2d 1425 (D.C. Cir. 1987), approvingly for the proposition that qualified immunity

10   defense did not foreclose all inquiry into a defendant's state of mind); *see also Gutierrez v.*

11   *Municipal Court of Southeast Judicial Dist.*, 838 F.2d 1031, 1051 (9th Cir. 1988) (holding that

12   "qualified immunity is not a defense in cases involving intentional racial or other similar

13   discrimination, including national origin"), *vacated as moot*, 490 U.S. 1016 (1989).

14   Defendants' best argument is that it was not clearly established that the consent given by Mr.

15   Cole to search his trunk was not voluntary.  However, although consent to a search is not necessarily

16   involuntary just because the consenting party is under arrest, *see Watson*, 423 U.S. at 425 (noting

17   that fact of custody alone is never enough in itself to demonstrate coerced consent to search), Mr.

18   Cole's claim is that the officers refused to release and uncuff him despite their knowledge there was

19   no probable cause for the arrest, until he consented to the search of the trunk.  The allegation of

20   purposeful coercion precludes summary judgment based on qualified immunity.

21   Accordingly, the Court denies Defendants' motion for summary judgment with respect to the

22   § 1983 claims against the individual officers.

23   D.    Section 1983 Claim against City

24   Having addressed the § 1983 claims against the individual officers, the Court now turns to

25   the § 1983 claim against the City.  Under Supreme Court case law, a municipality such as a city can

26   be held liable for a constitutional violation under § 1983 but only if the violation results from the

27   municipality's official policies or customs.  *See Monell v. Department of Soc. Servs.*, 436 U.S. 658,

28   694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its

17

United States District Court

For the Northern District of California

1   lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

2   injury that the government as an entity is responsible under § 1983.").

3          "A single constitutional deprivation ordinarily is insufficient to establish a longstanding

4   practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).  However, a single

5   constitutional deprivation can be an official policy under certain circumstances.  *See id.*  More

6   specifically, an isolated constitutional violation is an official policy for which a municipality can be

7   held liable when: (1) the person causing the violation has "final policymaking authority," *see id.* at

8   1235-36; (2) the person causing the violation is a subordinate but his or her action is "ratified" by

9   one with final policymaking authority, *see id.* at 1238; or (3) the person causing the violation is a

10  subordinate but one with final policymaking authority is "deliberately indifferent" to the

11  subordinate's action.  *See id.* at 1240.  The determination of who has final policymaking authority is

12  a question of law for the court to decide, not the jury.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.

13  701, 737 (1989) (superseded by statute on other grounds as stated in *Federation of African Am.*

14  *Contrs. v. City of Oakland*, 96 F.3d 1204, 1205 (9th Cir. 1996)).  More specifically, it is a question

15  of state law, which includes "state and local positive law as well as custom or usage having the force

16  of law."  *See id.*  Ratification is generally a question of fact for the jury, *see Christie*, 176 F.3d at

17  1238-39, and by implication, so too is deliberate indifference.  However, "as with any jury question,

18  a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification

19  occurred," *id.* at 1239, or deliberate indifference was exhibited.  *See id.* at 1240.

20         In the instant case, Mr. Cole argues that there should be municipal liability because of the

21  actions of the City's final policymaker, Chief of Police Ken James.[4]  More specifically, Mr. Cole

22  contends that Chief James acted with deliberate indifference to the violation of Mr. Cole's Fourth

23  Amendment rights in approving an internal affairs investigation that was clearly deficient, and that

24  Chief James thereby ratified the violations.

25

26

27         [4] The City does not contest Mr. Cole's characterization of Chief James as the City's final

28  policymaker.

**United States District Court**
For the Northern District of California

1    The problem with Mr. Cole's deliberate indifference argument is that it conflates the

2    deliberate indifference with the ratification bases for *Monell* liability.  A decisionmaker's deliberate

3    indifference typically establishes municipal liability where that indifference causes or leads to a

4    violation of rights, such as where officers are not adequately trained and that inadequate training

5    leads to injuries.  *See id.*  ("'Deliberate indifference is a stringent standard of fault, requiring proof

6    that a municipal actor disregarded a known or obvious *consequence* of his action.'"  *Id.* (emphasis

7    omitted and added); *see also City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("But it may

8    happen that in light of the duties assigned to specific officers or employees the need for more or

9    different training is so obvious, and the inadequacy *so likely to result in* the violation of

10   constitutional rights, that the policymakers of the city can reasonably be said to have been

11   deliberately indifferent to the need.") (emphasis added).

12   Here, the alleged deliberate indifference of Chief James did not result in or cause the

13   violation of Mr. Cole's constitutional rights, *i.e.*, the unreasonable search and/or seizure.  The

14   violation occurred prior to the alleged indifference.  The case on which Mr. Cole relies, *Fuller v.*

15   *City of Oakland*, 47 F.3d 1522 (9th Cir. 1995), is distinguishable.  In *Fuller*, the final policymaker

16   could have done something to prevent or remedy the constitutional violation.  *See id.* at 1534-35.

17   The plaintiff alleged violation of equal protection resulting from the ongoing sexual harassment.

18   The court concluded that the jury could find that chief of police acted with reckless disregard of

19   plaintiff's constitutional rights by approving a grossly inadequate investigation of her sexual

20   harassment charge.  The resultant failure to take action exposed the plaintiff to continued

21   harassment.  *See also Christie*, 176 F.3d at 1241 (concluding that jury could find that final

22   policymaker deliberately chose to allow subordinate's constitutional violations to continue).  In the

23   instant case, Mr. Cole does not contend that Chief James could have prevented the unreasonable

24   search or seizure of Mr. Cole because it had already taken place.  Thus, the only question is whether

25   there was a post-facto ratification when Chief James approved the internal affairs investigation.

26   The Supreme Court has held that, for ratification, the final policymaker must make a

27   deliberate choice from among various alternatives to follow a particular course of action.  *See*

28   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986).  The final policymaker must have

19

United States District Court

For the Northern District of California

1    approved not only the subordinate's decision but also the basis for it.  *See Praprotnik*, 485 U.S. at

2    127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their

3    ratification would be chargeable to the municipality because their decision is final.").  "Accordingly,

4    ratification requires, among other things, knowledge of the alleged constitutional violation."

5    *Christie*, 176 F.3d at 1239.

6         In the instant case, Mr. Cole has not submitted any authority establishing that ratification

7    may be accomplished without actual knowledge of the alleged prior constitutional violation.  There

8    is no evidence that Chief James had such knowledge.  Even if there might be some circumstances

9    where the final decisionmaker's deliberate indifference to an obvious violation might be deemed a

10   ratification, the facts here do not establish such a basis.[5]

11        Mr. Cole's citation to *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), is

12   inapposite.  In *Larez*, the city was liable under *Monell* for use of excessive force because *inter alia*,

13   it had flawed policies and procedures in the investigation of complaints against its officers.  *See id.*

14   at 646-47.  While the Ninth Circuit took note of "holes" and "inconsistencies" with the actual

15

16       [5] Mr. Cole asserts that the investigation was clearly deficient because, based on the interviews
     conducted by Sgt. Horton, there was an inconsistency in Officer Mayorga and Officer Alton's
17   testimony regarding the exact location of the traffic violation.  According to Officer Mayorga, the
     location was 32d and Helen but, according to Officer Alton, 32d and Louise.  However, no one,
18   including Chief James, followed up on that inconsistency.  Mr. Cole also argues that Sgt. Horton asked
     "completely biased and leading questions" during his interviews of the various officers and police
19   employees.  Opp'n at 15 (citing transcripts of interviews of dispatcher PST Tso and Sgt. Diotalevi).

20       That one officer thought that the failure to stop happened at the first intersection and the other
     that the failure to stop happened at the second intersection – at least by itself – is not something that
21   would suggest that the officers were clearly not credible.  As for Sgt. Horton's interviewing capabilities,
     they certainly could have been better but Sgt. Horton is not a lawyer; moreover, the testimony that Mr.
22   Cole cites as problematic is not that of either Officer Mayorga or Officer Alton – the key officers – but
     rather that of PST Tso and Sgt. Diotalevi.

23       In the instant case, Sgt. Horton interviewed not only the key officers, Officer Mayorga and
     Officer Alton, but also Sgt. Diotalevi, who was not directly involved in the encounter with Mr. Cole but
24   was present at the scene, and PST Tso, the dispatcher who initially told the officers that Mr. Cole's
     license was suspended.  In addition, Sgt. Horton interviewed Mr. Cole twice.  There is no evidence that
25   Sgt. Horton glossed over facts – for example, that the officers were in Oakland specifically looking for
     Mr. Cole because of information received from a confidential informant about potential drug possession.
26   In addition, even though Sgt. Horton determined that the allegations against Officer Mayorga and
     Officer Alton were unfounded he was not completely uncritical of the events that had taken place,
27   concluding, for instance, PST Tso did act improperly in carrying out her dispatch duties.  In addition,
     Chief James himself was not completely uncritical, including a handwritten note on the internal affairs
28   report that expressed concerns.  *See* McHenry Decl., Ex. 6 (internal affairs report) (under seal).

                                          20

1    investigation into the plaintiff's complaint which "should have been visible to any reasonable police

2    administrator," the court did not conclude that the city was liable under a ratification theory. *Id.* at

3    647 (internal quotation marks omitted).  Rather, the problems with the actual investigation were

4    considered evidence that the city engaged in a pattern and practice of condoning abusive police

5    conduct.  The chief's conduct in this case corroborated expert testimony that for years internal

6    investigations almost always exonerated the officers and that this inadequate disciplinary process

7    "executed by policy or custom" contributed to police excesses. *Id.*  There was also evidence of a

8    custom or policy of using excessive force for which the chief failed to take any remedial steps.  In

9    short, the chief's acceptance of an obviously flawed investigation constituted evidence of a pattern

10   and practice of condoning police abuse. *Larez* does not establish ratification by deliberate

11   indifference towards a single after-the-fact investigation.

12         Accordingly, the Court grants Defendants' motion for summary judgment with respect to the

13   § 1983 claim against the City.

14   E.    State Law Claims

15         1.    *Heck* Rule

16         Mr. Cole has asserted not only federal claims under § 1983 but also state claims based on

17   California Civil Code § 52.1 and the California Constitution and the common law (*i.e.*, battery and

18   false imprisonment).  All of the state claims are brought against the individual officers only, not the

19   City.  According to Defendants, each of the state claims is barred by the *Heck* rule discussed above.

20         Some state courts have applied the *Heck* rule to state claims arising from the same alleged

21   misconduct underlying a § 1983 claim. *See Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401,

22   1412-13 (2002) (noting that "it appears unsound to distinguish between section 1983 and state law

23   claims arising from the same alleged misconduct" and concluding that plaintiff's "state law claims

24   [for assault and battery, intentional infliction of emotional distress and false imprisonment] are

25   precluded by his standing conviction for resisting or obstructing a peace officer").  However, for the

26   same reasons as stated above in Part III.B, *supra*, *Heck* is not applicable to the instant case.

27

28

21

2.   <u>Battery</u>

California BAJI No. 7.50 provides that the "essential elements of a claim for battery" are as follows:

> 1.   Defendant intentionally did an act which resulted in a harmful [or offensive] contact with the plaintiff's person;
>
> 2.   Plaintiff did not consent to the contact;
>
> 3.   The harmful [or offensive] contact caused injury, damage, loss or harm to the plaintiff.

BAJI No. 7.50; *see also Barouh v. Haberman*, 26 Cal. App. 4th 40, 45 (1994) (noting that then-BAJI No. 7.51 provided that "'[a] battery is any intentional, unlawful and harmful contact by one person with the person of another'"; adding that the instruction "has been held a correct definition of battery"). The Witkin treatise similarly notes that "[h]armful or offensive contact, intentionally done, is the essence of a battery." 5 Witkin Sum. Cal. Law Torts § 347. According to Mr. Cole, because the officers did not have probable cause to stop him, any force used against him constituted a battery. Mr. Cole also maintains that, because the officers had no basis to detain him after learning that his driver's license was valid, the use of force thereafter -- in particular, the continued use of handcuffs -- also constituted a battery.[6]  *See* Opp'n at 18.

In their papers, both opening motion and reply, Defendants only challenged the battery claim under the *Heck* rule. Moreover, at the hearing, Defendants conceded that, if the facts were construed in Mr. Cole's favor, then there would be a genuine dispute of fact with respect to the battery claim precluding summary judgment. Therefore, the Court denies Defendants' motion for summary judgment with respect to the battery claim.

---

[6] Mr. Cole's battery claim is *not* predicated on the use of excessive force, as is common in many battery cases against police officers. *See, e.g., Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) (stating that a police officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force).

United States District Court

For the Northern District of California

3.    <u>False Imprisonment</u>

"The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000).  *See generally Scofield v. Critical Air Medicine*, 45 Cal. App. 4th 990 (1996) (discussing elements of tort of false imprisonment).  According to Mr. Cole, he was falsely imprisoned by the officers because they did not have probable cause to stop him or to detain him after learning the validity of his license.

As above, in both their opening motion and reply, Defendants only contested the false imprisonment claim on the basis of *Heck*, and, at the hearing, they admitted that there would be a genuine dispute of fact with respect to the false imprisonment claim if the facts were construed in Mr. Cole's favor.  Accordingly, Defendants' motion for summary judgment with respect to the false imprisonment claim, as with the battery claim, is denied.

4.    <u>California Constitution and California Civil Code § 52.1</u>

California Civil Code § 52.1 provides:

> (a)    If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California . . . .
>
> (b)    Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

1    Cal. Civ. Code § 52.1.  Article I, § 13 of the California Constitution provides: "The right of the

2    people to be secure in their persons, houses, papers, and effects against unreasonable seizures and

3    searches may not be violated; and a warrant may not issue except on probable cause, supported by

4    oath or affirmation, particularly describing the place to be searched and the persons and things to be

5    seized."

6          According to Mr. Cole, the individual officers violated § 52.1 by interfering with his right to

7    be free from an unreasonable search or seizure under the California Constitution in at least two

8    ways: (1) by using their power as police officers to stop Mr. Cole even though he had not committed

9    a traffic violation and (2) by coercing Mr. Cole to consent to the search of his car, in particular, his

10   trunk.

11         Mr. Cole has stated sufficient facts to proceed to trial.  Use of law enforcement authority to

12   effectuate a stop, detention (including use of handcuffs), and search can constitute interference by

13   "threat[], intimidation, or coercion" if the officer lacks probable cause to initiate the stop, maintain

14   the detention, and continue a search.  Cal. Civ. Code § 52.1(a).  In *Venegas v. County of Los*

15   *Angeles*, 32 Cal. 4th 820 (2004), the California Supreme Court permitted a cause of action under §

16   52.1 for unreasonable search and seizure even though there was no claim that the police used

17   excessive physical force in carrying out the search and seizure.  *See id.* at 843.  *See also Jones v.*

18   *Kmart Corp.*, 17 Cal. 4th 329, 334 (1998) (noting that § 52.1 "require[s] an attempted or completed

19   act of interference with a legal right, accompanied by *a form of coercion*") (emphasis added).

20         In an unpublished decision, *Whitworth v. City of Sonoma*, No. A103342, 2004 WL 2106606

21   (Cal. Ct. App. Sept. 22, 2004), a California appellate court held that the act of a police officer

22   physically barring (without actual use of force) the plaintiff from entering a meeting can constitute a

23   form of "coercion" under § 52.1.[7]  The court noted that § 52.1 does not by its terms require violence

24   _____

25         [7] California Rule of Court 977(a) prohibits citation or reliance by a court of an unpublished
     California Court of Appeal decision.  However, the rule is not binding in the federal courts, *see In re*
26   *Temporomandibular Joint Implant Products*, 113 F.3d 1484, 1493 n. 11 (8th Cir. 1997) (noting that
     California Rules of Court 976(d) and 977(a), "which limit the citation of opinions superseded by a grant
27   of review by the California Supreme Court[,] . . . are not binding on this Court"), and in any event is not
     cited as decisional law but rather for its persuasive reasoning.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d
28   891, 895 (9th Cir. 1996) (taking note of unpublished California state court opinion "[a]lthough pursuant
     to California Rule of Court 977(a) we do not cite this case as decisional law").

24

United States District Court

For the Northern District of California

1    or threat of violence.  It further noted that the statute was modeled on the Massachusetts Civil Rights

2    Act of 1979 which has been construed to cover "'an implicit threat of physical ejection or arrest.'"

3    *Id.* at *7 (quoting *Bally v. Northeastern Univ.*, 532 N.E. 2d 49, 53 (Mass. 1989).  As the court

4    explained:

5             Section 52.1 is modeled on the Massachusetts Civil Rights
      Act of 1979.  (*See Jones v. Kmart Corp.*, *supra*, 17 Cal.4th 329, 335, 70
6     Cal. Rptr. 2d 844, 949 P.2d 941.)  Decisions construing the
      Massachusetts statute may thus be consulted in applying our statute.
7     (*Id.* at pp. 335, 337, 70 Cal. Rptr. 2d 844, 949 P.2d 941, citing *Erlich
      v. Municipal Court* (1961) 55 Cal.2d 553, 558, 11 Cal. Rptr. 758, 360
8     P.2d 334.)  Massachusetts accepts the definitions of threats,
      intimidation, and coercion just quoted. (*E.g., Planned Parenthood v.
9     Blake* (Mass.1994) 417 Mass. 467, 631 N.E.2d 985, 990.)  In
      construing their virtually identical counterpart to the Bane Act, the
10    courts of Massachusetts have issued a number of rulings that are of
      great benefit to our analysis. (*See, e.g., Buster v. George W. Moore,
11    Inc.* (Mass.2003) 438 Mass. 635, 783 N.E.2d 399, 410 ["coercion may
      take various forms, and we have not limited its scope to actual or
12    attempted physical force"]; *Bally v. Northeastern University* (Mass.
      1989) 403 Mass. 713, 532 N.E.2d 49, 52-53.)  "[A]ctual or potential
13    physical confrontations involving a threat of harm" are sufficient.
      (*Planned Parenthood v. Blake*, *supra*, at pp. 989-990, fn. 8.)  Three
14    applications of the Massachusetts statute are particularly pertinent
      here.

15
              In *Batchelder v. Allied Stores Corp.* (Mass.1985) 393 Mass.
16    819, 473 N.E.2d 1128, a candidate for political office was distributing
      handbills on private property, as was his right under Massachusetts's
17    law.  A uniformed private security officer ordered him to stop.
      "Though Batchelder objected, he complied.  This was sufficient
18    intimidation or coercion to satisfy the statute."  (*Id.* at p. 1131.)  The . .
      . Supreme Court subsequently expanded upon this conclusion: "We
19    think our reasoning in that case supports a conclusion that the statute's
      coercion requirement was satisfied simply because *the natural effect of
20    the defendant's action was to coerce* Batchelder in the exercise of his
      rights." (*Redgrave v. Boston Symphony Orchestra* (Mass.1987) 399
21    Mass. 93, 502 N.E.2d 1375, 1379, italics added; *see Brunelle v. Lynn
      Public Schools* (Mass.2001) 433 Mass. 179, 740 N.E.2d 625, 628.)
22    The court also characterized *Batchelder* as involving "a physical
      confrontation accompanied by a threat of harm," i.e., an implicit threat
23    of physical ejection or arrest." (*Bally v. Northeastern University*,
      *supra*, 403 Mass. 713, 532 N.E.2d 49, 53.)

24

25   *Id.* (emphasis in original.).  The Court finds the Court of Appeals' analysis in *Whitworth* persuasive.

26         The Court therefore denies Defendants' motion for summary judgment with respect to the

27   claims against the individual officers under § 52.1.

28

                                            25

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Mr. Cole's § 1983 claim against the City is dismissed as is the § 1983 claim against the individual officers based on the Fourteenth Amendment (*i.e.*, equal protection).  All other claims asserted by Mr. Cole shall be allowed to proceed to trial.

This order disposes of Docket No. 57.


IT IS SO ORDERED.


Dated:  September 1, 2005

                                                             _____
                                                             EDWARD M. CHEN
                                                             United States Magistrate Judge